IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RUSSELL W. LORENCE,                     )
    Plaintiff,                        )
    v.                                )
KENNETH STOLLER d/b/a/                   )
TOP TECH LABS,and                       )
LINDAHL BROTHERS,Inc.,                  )
An Illinois Corporation                 )          2008 C 3620
                                      )
And                                     )          Judge Holderman
                                      )
JOSEPH BRUNO,                           )
                                      )
Respondent in Discovery                 )

Defendant, Lindahl Brothers, Inc.'s  Motion to Dismiss Pursuant to Rule 12(b)(6) and/ or for
Summary Judgment

Defendant, Lindahl Brothers, Inc., by its attorneys, Kinoy, Taren & Geraghty, P.C.,

moves this Court pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6) to dismiss the

Complaint for failure to state a claim upon which relief can be granted or, in the alternative, for

summary judgment against plaintiff.

In support of its motion, Lindahl submits the attached Affidavit of John Lindahl and

Memorandum of Law and states as follows:

1.   This action was originally filed in the Circuit Court of Cook County, Illinois,

    alleging various state law claims based on negligence against Lindahl and another

    defendant arising out of an allegedly defective in- house drug and alcohol testing

    program which resulted in plaintiff's termination from employment.

2.   Defendant Lindahl removed this action to the United States District on June 25, 2008

    claiming that this Court has jurisdiction over this matter pursuant to 28 U.S. C.

§1331, as the action is substantially dependent on analysis of a collective bargaining agreement which can only be litigated under federal law, specifically Section 301 of the National Labor Relations Act.

3.  Count II of the Complaint brought against Lindahl is based upon alleged negligence in the administration of an in house random drug and alcohol test which resulted in plaintiff's termination from his employment. (Complaint, ¶37)

4.  Plaintiff was a member of Local 731 of the International Brotherhood of Teamsters, and subject to a collective bargaining agreement between Local 731 and Lindahl Brothers, Inc. (See Affidavit of John Lindahl attached hereto as Exhibit 1)

5.  Article VI of the collective bargaining agreement requires that all disputes or grievances arising out of work and operations be settled and resolved pursuant to a grievance procedure as outlined in Article VI. (See Affidavit of John Lindahl, Exhibit A, Article VI.)

6.  Article XXX of the collective bargaining provides for a Uniform Drug/Alcohol Abuse Policy. (See Affidavit of John Lindahl, Exhibit A, Article XXX.)

7.  Pursuant to the collective bargaining agreement, plaintiff filed a grievance challenging his termination from employment based on an allegedly defective drug test. (Affidavit of John Lindahl, ¶5)

8.  The Labor/management committee of Teamsters Local 731 upheld the grievance ordering plaintiff to be reinstated immediately with no back pay or benefits awarded.(Affidavit of Lindahl ¶7.)

9.  Count II of plaintiff's complaint alleging negligence against Lindahl is completely preempted by Section 301(a) of the National Labor Relations Act., 301(a), 29 U.S. C.§185 and must be dismissed.

10. If this Court were to determine that plaintiff's purported claim for defamation is not preempted, it must be dismissed because it fails to state a cause of action and is barred by the applicable statute of limitations.

WHEREFORE, defendant Lindahl Brothers, Inc., respectfully requests that this Court dismiss Count II of the complaint with prejudice and for such other relief deemed just and equitable.

Respectfully Submitted

_____
s/**Miriam N. Geraghty**

Miriam N. Geraghty
Joanne Kinoy
Kinoy, Taren & Geraghty, P.C.
224 S. Michigan, Suite 300
Chicago, Il. 60604
312-663-5210

## AFFIDAVIT OF JOHN LINDAHL

John Lindahl, being duly sworn, deposes and states as follows:

1.      My name is John Lindahl and I am employed as Vice President and office manager at Lindahl Brothers Inc, a defendant in the matter captioned *Russell W. Lorence v. Kenneth Stoller and Lindahl Brothers, Inc. 1:08 cv 3620.*

2.      As part of my job duties at Lindahl, I supervise the drivers who work for Lindahl Brothers, Inc.

3.      Lindahl is a party to a collective bargaining agreement with the Teamsters, Local Union No. 731. Attached hereto as Exhibit A is the collective bargaining agreement entered into between Lindahl Brothers, Inc. and Local 731, covering the time period June 1, 2005 through May 31, 2009.

4.      Plaintiff Russell W. Lorence was a member of Teamsters Local Union 731 and thus subject to the terms and conditions of the collective bargaining agreement.

5.      Attached to this affidavit as Exhibit B is a Grievance Report filed by Russell Lorence dated October 23, 2006 claiming unlawful termination from his employment.

6.      Attached to this affidavit as Exhibit C is a notice of Mr. Lorences's grievance hearing which I attended on behalf of Lindahl. Lorence challenged his termination from employment on the basis that he had been given a defective drug test which had indicated a false positive for cocaine use.

7.      Attached to this affidavit as Exhibit D is a notice I received from the Labor /Management Committee upholding Mr. Lorence's grievance.

8.      Although we offered to reinstate Mr. Lorence, he told us he did not wish to return to work and was seeking employment elsewhere.

John Lindahl

Subscribed and Sworn before me
this 27th day of June, 2008

Notary Public   Susan Poplawski

OFFICIAL SEAL
SUSAN POPLAWSKI
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/14/11

# EXHIBIT A

# LINDAHL BROTHERS, INC. AGREEMENT

by and between

# TEAMSTERS LOCAL UNION NO. 731



affiliated with the

### *International Brotherhood of Teamsters*

and

### *Teamsters Joint Council No. 25*

effective

### *June 1, 2005 through May 31, 2009*

# CONSTRUCTION AGREEMENT

This Agreement entered into this First Day of June, 2005, by and between

## LINDAHL BROTHERS, INC.

## 622 E. GREEN ST., BENSENVILLE, IL 60106

(hereinafter referred to as the "EMPLOYER"), and EXCAVATING, GRADING, ASPHALT, PRIVATE SCAVENGERS, AUTOMOBILE SALESROOM GARAGE ATTENDANTS, LINEN AND LAUNDRY LOCAL UNION NO. 731, affiliated with the International Brotherhood of Teamsters (hereinafter referred to as the "UNION"). This Agreement shall be known as the Teamsters Local Union No. 731 Construction Agreement.

### WITNESSETH

1.  The purpose of this Agreement is (a) to enter into a definite labor-management contract covering the wages, hours, conditions of work and terms of employment in the relationship between EMPLOYER and Employee; (b) to prevent strikes, lockouts, and work stoppages; (c) to adopt suitable measures for the peaceful settlement of grievances and differences; (d) to secure to members of the Association or other Employers sufficient capable Employees; (e) to protect the economic and employment welfare of Employees.

2.  It is mutually understood and agreed that the following terms relating to the wages, hours and working conditions of Employees covered by this Agreement have been decided upon by means of collective bargaining, and that the following provisions will be binding upon the parties to this Agreement during the terms of this Agreement and any renewal period thereof.

### ARTICLE I – RECOGNITION AND SCOPE OF AGREEMENT

Section 1.1 *Geographic Coverage:* The geographic area is the area covered by I.B. of T. Local No. 731 within the jurisdiction of I.B. of T. Joint Council No. 25.

Sec. 1.2 *Recognition:* The EMPLOYER recognizes the UNION as the sole and exclusive bargaining agent with respect to rates of pay, hours of work, and all other conditions of employment for all Employees covered by this Agreement.

Sec. 1.3 *Bargaining Unit:* Employees covered by this Agreement are all Employees in the classifications of work covered by this Agreement, employed by the Employers in the contract territory and engaged in the work described in Section 1.4 hereof.

Sec. 1.4 *Work Covered:* Jurisdiction. This Agreement shall apply to Employees in the classifications herein set forth in the performance of work involved in the following operations:

a. *Heavy Construction:*  Heavy construction is defined as constructing substantially in its entirety any fixed structure, other improvement or modification thereof, or an addition or repair thereto, including any structure or operation which is an incidental part of a contract thereof, including without limitation, railroads and street railway construction projects, sewers, water mains, grade separations, foundations, pile driving, piers, abutments retaining highways, drainage projects, sanitation projects, aqueducts, irrigation projects, flood control projects, reclamation projects, reservoirs, water supply projects, water power development, hydro-electric development, duct lines, locks, pipelines, dams, dikes, levees, revetments, channels, channel cutoffs, intakes, dredging projects, jetties, breakwaters, docks, harbors, industrial sites, airports, excavation, disposal of earth rock and stockpiling.

b. *Highway Construction Work:*  Highway construction work is defined as all work ordinarily included in highway construction contracts, bridges, sewer and street grading, street paving, curb setting, sidewalks, stockpiling, etc.; and landscaping on work where prevailing wage rules are in effect.

c. Removal and disposal of rubbish from wrecking jobs.

d. Snow removal.

e. Hauling of cinders, slag, asphalt (including liquid asphalt), sand fill and all other types of fill on construction jobs.

f. Delivery to and spreading on the construction site or the road bed of any stabilized base material to be used as subsurface, including but not limited to fill, Poz-o-Pac, aggregate materials, Bituminous aggregate materials, Cement aggregate materials, or any other trade name of base or paving material.

g. Back filling.

h. Digging.

i. Leveling and grading.

j. Street sweeping, sprinkling and flushing.

k. Concrete breaking.

l. Pipeline work.

m. Pavement marking and sealing.

n. Construction, slag and sludge hauling or any other trucking in or out of steel mills.

o. Hauling of salt.

p. Asphalt plant in areas where it has been past practice.

3

q.  The hauling of recycled broken concrete and recycled asphalt.

r.  Concrete Pumper Trucks.

s.  Concrete Crushing Plants.

Sec. 1.5 The work listed in Section 1.4 above is listed for the purpose of describing work customarily and/or traditionally performed by the Employees covered by the Agreement and for no other purpose.

## ARTICLE II -- UNION SECURITY

Section 2.1 *Maintenance of Membership:*  Present Employees who are members of the UNION must, as a condition of employment, maintain such membership during the term of this Agreement to the maximum extent permitted under law.

Sec. 2.2 *New Employees:*  New Employees shall, as a condition of employment, become members of the UNION to the maximum extent permitted under law, on the eighth day after the beginning of employment or after the execution date of this Agreement, whichever is later, and shall maintain such membership as a condition of continued employment.

Sec. 2.3 *Enforcement:*  Any Employee who refuses or fails to fulfill the obligations of Sections 2.1 or 2.2 above, shall forfeit his right of employment; and the EMPLOYER shall discharge such Employee within three (3) working days of receiving written notice from the UNION of the failure of an Employee to fulfill said obligations; provided that the UNION shall hold the EMPLOYER harmless for demands under this Section not in accord with federal law.

Sec. 2.4 *Additional Employees:*  When the EMPLOYER needs additional Employees; it shall give the Local Union equal opportunity with all sources to provide suitable applicants, but shall not be required to hire those referred by the UNION.  The names and addresses of all new Employees shall be furnished to the office of the UNION not later than the first pay period after their hiring.

## ARTICLE III -- SUBCONTRACTING

Section 3.1(a) The EMPLOYER agrees that neither it nor any of its subcontractors on the job site will subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure, road or other work (including quarries, rock, sand and gravel plants, asphalt plants, ready-mix concrete plants established on or adjacent to the job site to process or supply materials for the convenience of the contractor for job site use) except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate Union, or subordinate body signatory to this Agreement.

4

Sec. 3.1(b) The EMPLOYER agrees that stone, stabilized base materials, sand and gravel will be spread or distributed on a construction site including road beds, exclusively by Employees covered by this Agreement. Deliveries of stone, stabilized base materials, sand and gravel by Employees, firms or entities not covered by this Agreement shall be made exclusively to stock piles and the EMPLOYER ordering those materials for delivery by a third party is responsible to see that the provisions of this Section are not violated, provided that the UNION shall hold the EMPLOYER harmless for suits or demands under this Section not in accord with federal law.

Sec. 3.2(a) In order to protect the wages, working conditions and job opportunities of Employees employed under this Agreement, the EMPLOYER agrees that when subcontracting work covered by this Agreement which is to be performed within the geographical area covered by this Agreement, but which is not to be performed at the site of the construction, alteration, painting or repair of the building, road or other work, it will subcontract such work only to an EMPLOYER or person who agrees that the persons performing such work will work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement including holidays, vacations, premiums, overtime, health and welfare and pension contributions or benefits or their equivalent and any other programs or contributions required by this Agreement and who further agrees to submit any grievance or disputes concerning its performance or compliance with such undertaking to the procedures set forth in Article VI of this Agreement.

Sec. 3.2(b) The EMPLOYER will give written notice to the UNION of any subcontract involving the performance of work covered by this Agreement within five (5) days of entering into such subcontract and shall specify the name and address of the subcontractor. Any EMPLOYER who gives such notice and requires the subcontractor to agree to comply with and observe the provisions of Section 3.1 hereof with respect to job site work and Section 3.2 hereof with respect to work performed other than at the job site shall not be liable for any delinquency by such subcontractor in the payment of any wages, fringes, benefits or contributions provided herein, except as provided hereinafter.

If thereafter any subcontractor shall become delinquent in the payment or meeting of the obligations set forth above, the UNION shall promptly give written notice thereof to the EMPLOYER and subcontractor specifying the nature and amount of such delinquency. More than one such notice may be given with respect to delinquencies. If such notice is given, the EMPLOYER shall withhold the amount claimed to be delinquent out of any sums due and owing by the EMPLOYER to such subcontractor and shall pay and satisfy there from the amount of such delinquency by such subcontractor as follows:

If such subcontractor does not dispute the existence or amount of such delinquency, the EMPLOYER shall forthwith pay the amount of such delinquencies to the person or Fund entitled thereto. Any dispute as to the existence or amount of such delinquency shall be settled by the UNION and subcontractor, as provided in Article VI hereof, and the EMPLOYER shall pay the person or Funds entitled thereto the amount of such delinquency as so determined and costs incurred.

The EMPLOYER shall not be liable for any such delinquency occurring more than sixty (60) days prior to the receipt of such written notice from the UNION.

Sec. 3.2(c) Upon written proof by the UNION that the Employer's subcontractors are not in substantial compliance with Articles 3.1 or 3.2, the EMPLOYER shall cease employment of such subcontractor on all of its projects within three (3) working days receipt of written notice. Furthermore, the UNION shall indemnify and hold harmless the EMPLOYER for all costs including attorney's fees associated with defense of claims brought by such subcontractors against EMPLOYER if said subcontractor is found not to be in violation.

Sec. 3.3 Notwithstanding any other provision of this Agreement, any and all disputes involving this Article III shall be resolved exclusively through the Grievance and Arbitration provisions of Article VI of this Agreement.

## ARTICLE IV – PRE-JOB CONFERENCE

Section 4.1 Before commencing any job, an EMPLOYER shall meet with the UNION for a pre-job conference for the purpose of advising the UNION of the Employer's requirements as to the number of Employees, the probable starting date, duration of the job, working schedules and other matters affecting Employees. This shall not apply to an EMPLOYER permanently domiciled within the area of the Local Union's jurisdiction. All contractors, including all local contractors, shall provide a list of subcontractors and owner-driver or drivers to the Local Union three (3) days prior to commencement of work.

Sec. 4.2 When a project is within the territory of more than one Local Union, the determination of the division of Employees for representation purposes shall be made by an Agreement between the Local Unions and the EMPLOYER. In the event the Local Union and the EMPLOYER are unable to reach such an Agreement, the issue shall be referred within five (5) days to Teamsters Joint Council No. 25. Representatives of Teamsters Joint Council No. 25 shall meet with the EMPLOYER involved to settle this dispute and their joint decision shall be final and binding on all parties concerned. If a contractor evades a pre-job conference, he automatically forfeits his right to the grievance procedure.

## ARTICLE V – NO STRIKES OR LOCKOUTS

Section 5.1 In view of the fact that parties have provided for an orderly procedure for settling differences of opinions and disputes, the UNION agrees that for the duration of this Agreement, there shall be no strikes, except as otherwise herein provided, and the EMPLOYER agrees that during the life of this Agreement there shall be no lockouts. The provisions of this Article shall not apply to any EMPLOYER that refuses to follow the procedures outlined in Article VI.

## ARTICLE VI – GRIEVANCES AND ARBITRATION

Section 6.1 All disputes or grievances arising out of work and operations under this Agreement shall be settled and resolved as provided in this Article except as otherwise herein provided.

Sec. 6.2 A dispute or grievance not resolvable by Foreman or Superintendent shall be first taken up between the EMPLOYER and a representative of the Local Union having geographic jurisdiction within the contract territory within seven (7) working days after the date of the occurrence which is the subject of the dispute or grievance, or no action shall be required.

Sec. 6.3 In the event that the grievance cannot be resolved within two (2) working days of the provisions of Section 6.2, it shall be reduced to writing and referred for conference and resolution by designated officials of the UNION and the EMPLOYER. If the grievance cannot be resolved, the written grievance shall be submitted directly to the Joint Grievance Committee in accordance with this Article.

Sec. 6.4 In the event the grievance cannot be resolved by the provisions of Section 6.3 within seven (7) working days after receipt by the UNION and the Association of the written grievance, the written grievance shall be submitted immediately to the Joint Grievance Committee created in this Article.

Sec. 6.5 No action shall be required on Employee complaints as to wages and working conditions unless made within ten (10) working days of the supposed violation.

Sec. 6.6 The EMPLOYER and the UNION shall together create and appoint a permanent Joint Area Committee consisting of an equal number of members representing the Employers and UNION, but no less than three (3) from each group. Alternates may also be appointed. The Joint Area Committee shall, at its first meeting, formulate rules of procedure to govern the conduct of its proceedings.

Sec. 6.7 It shall be the function of the Joint Area Committee to resolve disputes or grievances which cannot be settled under Section 6.3.

Sec. 6.8(a) No EMPLOYER shall sit on a panel of the Joint Area Committee which is hearing or considering a grievance or dispute arising from his own operations.

Sec. 6.8(b) No Local Union shall sit on a panel of the Joint Area Committee which is hearing or considering a grievance or dispute arising from a job over which such Local Union has geographical jurisdiction.

Sec. 6.9 When the Joint Area Committee, by a majority vote, decides a dispute or grievance, such decision shall be final and binding on all parties.

Sec. 6.10 All monetary issues regarding a grievance that has been resolved either by committee decision or mutual settlement, same shall be satisfied within thirty (30) calendar days of formal notification of the decision or date of settlement.

Sec. 6.11 When the Joint Area Committee is unable to decide a dispute or grievance, it may be submitted at the option of the moving party within thirty (30) days to an arbitrator jointly selected by the Committee from a panel of five (5) potential arbitrators provided by the American Arbitration Association and/or the Federal Mediation and Conciliation Service. Each party shall alternately strike names from the list, the moving party striking first, until one arbitrator remains. The decision of the arbitrator shall be final and binding upon all parties.

Sec. 6.12 The expense of the arbitrator shall be jointly paid by the EMPLOYER and the UNION between whom the grievance or dispute exits.

7

Sec. 6.13 The arbitrator shall have no authority to add to, detract from, or in any way alter the provisions of this Agreement.

## ARTICLE VII – JURISDICTIONAL DISPUTE

Section 7.1 In the event of a jurisdictional dispute between the Unions party to this Agreement and another labor organization who is party to a collective bargaining agreement with the EMPLOYER, the EMPLOYER or the UNION shall request such Unions or labor organizations involved to send representatives to a mutually agreed location to meet to settle the dispute.

Sec. 7.2 The meeting referred to in Section 7.1 shall be held at a mutually agreed location within three (3) working days of the request for such a meeting by either of the disputing labor organizations, UNION, or the EMPLOYER, and shall be between the EMPLOYER and the representatives of the disputing Unions and labor organizations. At this meeting, the disputing Unions and labor organizations shall submit whatever evidence and arguments they contend to support their respective positions.

Sec. 7.3 Not later than twenty-four (24) hours after conclusion of the meeting referred to in Sections 7.1 and 7.2 above, the EMPLOYER shall make a written assignment of said disputed work, and serve copies of same on all interested parties.

Sec. 7.4 Whenever the assignment made by the EMPLOYER in Section 7.3 above is not agreeable to the Unions or labor organizations, the provisions of this Agreement shall prevail until a jurisdictional award has been made by the proper jurisdictional board of the International Unions of which the local disputing labor organizations are members. Employers agree to abide by such jurisdictional award for that project, providing that the EMPLOYER was given the opportunity to present information pertinent to the jurisdictional dispute, but there shall be no work stoppage while the settlement of this dispute is pending.

## ARTICLE VIII – WAGES

Section 8.1 The following rates of hourly pay shall prevail during the period herein set forth.

To maintain the efficiency and skills of the workforce due to ongoing changes in equipment and technology, the parties recognize the importance of employees continuing to develop their skill and knowledge so they are qualified to deal with such changes. Therefore, *effective June 1, 2005,* the EMPLOYER agrees to contribute five cents ($0.05) per hour / per employee to the Teamsters Joint Council No. 25 Training Fund.

*Effective June 1, 2006* the EMPLOYER agrees to contribute an additional five cents ($0.05) per hour / per employee who is covered by this agreement to the Teamsters Joint Council No. 25 Training Fund.

*Effective June 1, 2007* the EMPLOYER agrees to contribute an additional five cents ($0.05) per hour / per employee who is covered by this agreement to the Teamsters Joint Council No. 25 Training Fund.

Effective July 1, 2000 ten cents ($0.10) shall be allocated to the Labor/Management Cooperation Committee that shall be known as the "Task Force" to be utilized to monitor and police the construction industry. The initial ten cents ($0.10) will be in effect throughout the duration of the Agreement.

Work or services performed at the construction site, which includes driving trucks to and from and the spreading on the construction site or the road bed of any base material to be used for such a sub-surface, which shall include, but not be limited to fill, gravel, blacktop, cement, or Poz-o-Pac, and building, wrecking, excavating and renovation shall be covered by the hourly rates set forth below.

Sec. 8.2 The trucks listed in this Section shall be classified and drivers paid on the following axle basis:

## ▼ ▼ *EFFECTIVE JUNE 1, 2005*\* ▼ ▼
### *INCREASE OF $1.10 PER HOUR FOR ALL CLASSIFICATIONS*

### *Retroactive Pay:*

The parties agree that the total economic package herein contained shall be retroactive to the day after the expiration date of the contract. *(June 1, 2005).*

### *ALLOCATION BREAKDOWN REGARDING THE FIRST YEAR OF THE AGREEMENT:*

| | |
|---|---|
| WAGES .............................................. | $ 0.15 |
| HEALTH/WELFARE.................................... | $ 0.50 |
| PENSION FUND...................................... | $ 0.40 |
| JC NO. 25 TRAINING FUND................. | $ 0.05 |

### *CLASSIFICATION:*

| | |
|---|---|
| Group 1 – 2 or 3 Axle Trucks ........................ | $28.70 |
| Group 2 – 4 Axle Trucks ............................... | $28.95 |
| Group 3 – 5 Axle Trucks ............................... | $29.15 |
| Group 4 – 6 Axle Trucks ............................... | $29.35 |

Group 5 – An additional $0.20 per axle shall be paid for all vehicles with more than 6 axles.
Group 6 - Self Articulated End Dump and

| | |
|---|---|
| Sweeper Drivers................... | $28.70 - for employees hired prior to 10/01/95 |
| New Hire Rate..................... | $24.85 – for employees hired after 10/01/95 |

*New Hire Rate:* All new hires shall receive one dollar ($1.00) per hour less than the negotiated wage rate during the first twelve (12) months of employment. New hire classifications will remain for one (1) calendar year from the date of hire.

*There shall be an increase in Wages and/or Fringe Benefits (Health & Welfare Fund, Pension Fund and/or Industry Funds) according to the following schedule.  Allocation of these amounts between Wages and/or Fringe Benefit Funds shall be determined by the Local Union Executive Board thirty (30) days prior to the effective date of the increase.

## *ADDITIONAL ANNUAL INCREASES:*

▼Effective June 1, 2006.................................     $1.75 per hour
▼Effective June 1, 2007.................................     $1.85 per hour
▼Effective June 1, 2008.................................     $2.00 per hour

Sec. 8.3(a) The classifications listed in this Section shall be paid on the following basis:

## *GROUP 1.*

A-Frame Truck when used for transportation purposes
Air Compressors and Welding Machines, including those pulled by cars, pick-up trucks and tractors
Ambulances
Articulated Dump
Batch Gate Locker
Batch Hopperman
Car and Truck Washers
Carry Alls
Fork Lifts and Hoisters
Helpers
Mechanics Helpers and Greasers
Oil Distributors, 1-Man operation
Pavement Breakers
Pole Trailer, up to 40 feet
Pothole Repair Truck
Power Mower Tractors
Quick Change Barrier Truck
Self-Articulating End Dump
Self-Propelled Chip Spreader
Shipping and Receiving Clerks and Checkers
Skipman
Slurry Trucks, 2-Man operation
Slurry Trucks, Conveyor Operated – 2 or 3 man operation
Street Sweepers
Teamsters
Unskilled Dumpmen
Warehousemen and Dockmen
Truck Drivers hauling warning lights, barricades, and portable toilets on the job site.

### GROUP 2.

Dispatcher
Dump Crets and Adgetors under 7 yards
Dumpsters, Track Trucks, Euclids, Hug Bottom Dump Turnapulls or Turntrailers when pulling
other than self-loading equipment or similar equipment under 16 cubic yards
Mixer Trucks under 7 yards
Ready-Mix Plant Hopper Operator
Winch Trucks, 2 Axles

### GROUP 3.

Dump Crets and Adgetors 7 yards and over
Dumpsters, Track Trucks, Euclids, Hug Bottom Dump Turntrailers or Turnapulls when pulling
other than self-loading equipment or similar equipment over 16 cubic yards
Explosives and/or Fission Material Trucks
Mixer Trucks 7 yards or over
Mobile Cranes while in transit
Pole Trailer, over 40 feet
Pole and Expandable Trailers hauling material over 50 feet long
Slurry Trucks, 1-Man operation
Winch Trucks, 3 axles or more
Mechanic -*Truck Welder and *Truck Painter

*These classifications shall only apply in areas where and when it has been a past practice.*

### GROUP 4.

Asphalt Plant Operators in areas where it has been past practice
Dual-purpose vehicles, such as mounted crane trucks with hoist and accessories
Foreman
Master Mechanic
Self-loading equipment like P.B. and trucks with scoops on the front

Sec. 8.3(b) The vehicles listed hereunder shall be classified, and the drivers compensated for,
based upon the number of axles on each vehicle.

| | | |
|---|---|---|
| Bulk Tank Trucks | Buses | Service Trucks |
| Dry Batch Trucks | Dump/Conveyor Trucks | Fuel Trucks |
| Grease Trucks | Telescope Trucks | Lowboys |
| Water Trucks | Scissor Trucks | |

Sec. 8.4 Drivers operating different types and sizes of equipment on the same day which they
operate for two (2) hours or more shall be paid the rate governing the highest rated equipment
operated for the entire day.

Sec. 8.5 The EMPLOYER agrees to notify the Union Representative when using new types of equipment not formerly utilized by the EMPLOYER. The Negotiating Committee of the EMPLOYER and the UNION shall meet to immediately negotiate the wage scale for same. The agreed rate shall be retroactive to the equipment's first day of use.

Sec. 8.6 An Employee's pay shall start at whatever time the Employee reports for work as instructed by the EMPLOYER, or as provided for in Section 12.3, and shall not stop until his truck is through working, including fueling and the checking of oil if requested by the EMPLOYER.

Sec. 8.7 All Employees shall be paid weekly and no more than five (5) days shall be withheld. The Employee's paycheck shall be ready for him no later than quitting time on the designated payday.

Sec. 8.8 The EMPLOYER shall list on each Employee's check stub the amount of straight-time hours and the amount of overtime hours, as well as all deductions from the check.

Sec. 8.9 An Employee who was injured on the job, and is sent home, or to a hospital, or who must obtain medical attention, shall receive pay at the applicable hourly rate for the balance of his regular straight-time shift on that day. An Employee who has returned to his regular duties after sustaining a compensable injury who is required by the employer's doctor to receive additional medical treatment during his regularly scheduled working hours shall receive his regular hourly rate of pay for the straight-time hours lost from work.

## ARTICLE IX – HEALTH AND WELFARE FUND

Section 9.1(a) The EMPLOYER shall pay to the Health and Welfare Fund, Excavating, Grading and Asphalt Craft, Local Union No. 731, I.B. of T. (hereinafter referred to as "Health and Welfare Fund"), located at 1000 Burr Ridge Parkway, Suite 301, Burr Ridge, Illinois 60527, the sum of Five Dollars ($5.00) per hour effective June 1, 2005, for each hour worked by each Employee covered by this Agreement.

> Effective June 1, 2006........................ $1.75 per hour*
> Effective June 1, 2007........................ $1.85 per hour*
> Effective June 1, 2008........................ $2.00 per hour*

*There shall be an increase in Wages and/or Fringe Benefits (Health & Welfare Fund and Pension Fund) according to the following schedule. Allocation of these amounts between Wages and/or Fringe Benefit Funds shall be determined by the Local Union Executive Board thirty (30) days prior to the effective date of the increase.

Sec. 9.1(b) *Penalty for Failure to Pay Health and Welfare:* The EMPLOYER recognizes the necessity of making prompt Health and Welfare contributions, the possibility that Employees' benefit standing will be placed in jeopardy if contributions are not timely made, and the concern of the UNION that all eligible Employees are covered by such contributions.

Whenever the EMPLOYER is delinquent in making payments to the Health and Welfare Fund, the UNION may strike the EMPLOYER to force payments.

This provision shall not be subject to and is specifically excluded from the grievance procedure (Article VI). Additionally, in the event the EMPLOYER has been found to be delinquent, the EMPLOYER shall be required to pay in addition to the actual delinquency, twenty percent (20%) of the delinquent amount as liquidated damages, and accountant and attorney fees and court costs.

## *ARTICLE X – PENSION FUND*

Section 10.1(a) The EMPLOYER shall pay to the Local Union No. 731 Excavators and Pavers Pension Fund (hereinafter referred to as "Pension Fund"), located at 1000 Burr Ridge Parkway, Suite 301, Burr Ridge, IL 60527, the sum of Three Dollars and Seventy Cents ($3.70) per hour effective June 1, 2005, for each hour worked by each Employee covered by this Agreement.

> Effective June 1, 2006.......................$1.75 per hour*
> Effective June 1, 2007.......................$1.85 per hour*
> Effective June 1, 2008.......................$2.00 per hour*

*There shall be an increase in Wages and/or Fringe Benefits (Health & Welfare Fund and Pension Fund) according to the following schedule. Allocation of these amounts between Wages and/or Fringe Benefit Funds shall be determined by the Local Union Executive Board thirty (30) days prior to the effective date of the increase:

Sec. 10.1(b) The EMPLOYER shall also submit a Remittance Report in a form to be furnished by the Administrators of the Health and Welfare and Pension Fund showing the name of each Employee employed during the period for which the report is made. The Remittance Form and required contributions shall be submitted each month to the Administrator of each Fund not later than the twentieth (20th) day of the month following the month for which contributions are due.

Sec. 10.1(c) The EMPLOYER agrees that it is bound by and is a party to the Trust Agreements creating the Health and Welfare Fund and the Pension Fund, and all prior and subsequent amendments thereto, as if it had signed the original copy of each of the said Trust Agreements, both of which said Agreements being incorporated herein by reference and made a part hereof; the EMPLOYER hereby designates as its representatives on the Board of Trustees of said Funds such Trustees as are named in said Agreements and Declarations of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreements and Declarations of Trust, as they may be amended from time to time and further agrees to be bound by all action taken by said Employer Trustees regarding and pursuant to the said Agreements and Declarations of Trust as amended from time to time.

Sec. 10.1(d) *Penalty for Failure to Pay Pension:* The EMPLOYER recognizes the necessity of making prompt Pension contributions when required, the possibility that Employees' benefit standing could be placed in jeopardy if required contributions are not timely made, and the concern of the UNION that all eligible Employees are covered by such required contributions.

Whenever the EMPLOYER is delinquent in making required payments to the Pension Fund, the UNION may strike the EMPLOYER to force required payments.

This provision shall not be subject to and is specifically excluded from the grievance procedure (Article VI). If an EMPLOYER fails to pay any required contributions due in accordance with this Article, the Trustees of the respective Fund may assess the EMPLOYER twenty percent (20%) of the required contributions due as liquidated damages in addition to all reasonable attorney fees, accountant fees and cost of collection.

### *ARTICLE XI – CHECK-OFF*

Section 11.1 Upon receipt of a written authorization from the Employee on a form provided by the UNION, the EMPLOYER agrees to deduct initiation fees and reinitiation fees and monthly UNION dues from the pay of each such Employee in the amount and manner prescribed by the UNION in accordance with its Constitution and By-Laws, and shall remit same to the UNION within ten (10) days from its collection.

Sec. 11.2 The UNION shall indemnify, defend, and save the EMPLOYER harmless against any and all claims, demands, suits, or other forms of liability that shall arise out of or by reason of action taken, or not taken by the EMPLOYER for the purpose of complying with any provisions of the Article or reliance upon any list, notices, or assignments furnished under this Article.

### *ARTICLE XII – WORKING HOURS AND OVERTIME*

Section 12.1 Eight (8) continuous hours (not including meal period referred to in Article 12.6(a) shall constitute a workday. Forty (40) straight-time hours, Monday through Saturday, shall constitute a workweek, without regard to the weekly pay period as established by the EMPLOYER.

Sec. 12.2 Time and one-half (1½) shall be paid for all time worked over eight (8) hours in any one (1) day, and over forty (40) hours in one week, Monday through Friday, and hours worked on Saturday (unless an Employee works a Saturday as a make-up day as determined in this Section). Effective upon execution of this Agreement, if an Employee calls off or voluntarily leaves work before the workday is concluded for any reason, or misses hours of work because of weather or conditions beyond the control of the EMPLOYER during the Monday through Friday workweek, then Saturday shall be paid as a non-premium make-up day. Otherwise, Saturday shall be paid at the applicable overtime rate of time and one-half (1½) for all hours worked.

Sec. 12.3 Employees starting work after 12:00 Noon, shall be paid a fifty cents ($0.50) per hour shift differential in addition to their straight-time hourly rate for all work performed on a second shift and Employees starting work between 10:00 P.M. and 1:00 A.M. shall receive fifty cents ($0.50) per hour in addition to their straight-time hourly rate for the third shift.

Sec 12.4 If an employee is ordered to start work by his EMPLOYER, Monday through Friday, he shall not receive less than four (4) hours straight-time pay. If an employee works more than four (4) hours in any one workday, Monday through Friday, he shall be guaranteed eight (8) hours of pay for that day. If he starts work on a make-up day, Saturday, Sunday and holidays, he shall not receive less than four (4) hours pay at the applicable hourly rate.

Sec. 12.5 *Sunday Work:* All work performed on any Sunday shall be paid at the applicable double time rate.

14

Sec. 12.6(a) *Meal Period:* One-half hour unpaid meal period will fall between the fourth (4th) and the end of the fifth (5th) hour on all shifts.

Sec. 12.6(b) Employees who are required to work through their meal period and do work through their meal period shall be paid the straight-time hourly rate for such time worked.

Sec. 12.7 Employers who require a Teamster Employee to be out-of-town and stay overnight, shall reimburse the Employee for expenses in a reasonable and customary manner, upon proof of receipt.

## ARTICLE XIII – GENERAL CONDITIONS

Section 13.1(a) *Seniority:* Seniority as the term is used herein, means length of continuous service of any regular Employee from the date of first employment by the EMPLOYER as hereinafter provided.

Sec. 13.1(b) New Employees shall be regarded as probationary Employees until they have acquired seniority rights. Probationary Employees shall attain seniority rights when they have been actually at work in the employ of the EMPLOYER for a total of ninety (90) worked days or one hundred and twenty (120) calendar days, whichever comes first. There shall be no responsibility for the reemployment of probationary Employees if they are laid off or discharged prior to attaining seniority rights. After ninety (90) worked days, or one hundred and twenty (120) calendar days, whichever comes first, of employment as above defined, the names of such Employees shall be placed on the seniority list as provided in Section 13.1(b) with a service credit of ninety (90) days, reverting back to the first day of hire. The UNION shall receive a seniority list upon request.

Any Employee covered by this Agreement who accepts a promotion to a salaried position with the EMPLOYER shall retain all previously accumulated seniority for a period of twelve (12) consecutive months.

Sec. 13.1(c) In case of layoff due to lack of work, Employees shall be laid off in reverse order of seniority, providing the senior Employee is qualified to replace the laid-off Employee.

Sec. 13.1(d) The recall procedure shall be the reverse of the layoff procedure. When work increases, Employees laid off shall be notified to report to work in order of seniority.

Sec. 13.1(e) Failure by an Employee to return to work within five (5) consecutive working days after notice or attempted notice, by telephone or certified mail to the Employee's last known phone number or address, with a copy being sent to the UNION, shall result in loss of seniority rights. The UNION shall be notified by the EMPLOYER the same day as the Employee. The five (5) consecutive days do not begin to run until the UNION has been notified by the EMPLOYER. The UNION may furnish temporary drivers, if required to do so, until the laid-off Employee returns to work.

Sec. 13.1(f) If there are breakdowns or shut-downs during the day, an Employee whose vehicle is broken down or whose operations are shut-down shall go home for the completion of the workday and shall be paid as provided in Article 12; however, the EMPLOYER may assign him to perform other duties at his prevailing wage rate for that day. When a vehicle shall be out of service for more than that day, seniority shall prevail on the following day.

Sec. 13.1(g) Seniority shall be broken by discharge, voluntary quit, failure to report after five (5) working days as outlined in Section 13.1(e), or by layoff for twelve (12) consecutive months.

Sec. 13.1(h) Where Employees have been scheduled the night before from the permanent location, and due to circumstances some jobs are cancelled, the EMPLOYER shall not be required to change the schedule for the following day. Seniority shall prevail on the next following day.

Sec. 13.1(i) Where the same EMPLOYER has more than one job in progress, working out of different garages or parking sites and at the starting time of the job, due to weather or other conditions beyond the Employer's control, the job is not able to work and no decision can be made as to when the job can go, such layoffs shall not exceed more than two (2) working days. After the expiration of two (2) days the Employee, according to his company seniority, shall be entitled to transfer to another job of the EMPLOYER if there are Employees of less seniority working for the EMPLOYER on another job. When an Employee requests a transfer to another job site such Employee shall stay at said job site until its completion or until the Employee is laid off.

Notwithstanding the foregoing, the EMPLOYER may permit a transfer immediately upon the layoff without waiting two (2) days.

All Employees domiciled at the same location will be assigned to work according to their seniority, providing they are qualified. This will not affect the daily starting time.

Sec. 13.2 When hauling blacktop or similar material, drivers shall have a platform to stand on to roll their tarps at the plant.

Sec. 13.3 If the Employee is directed to take a truck to a job site or a garage and leave it at same, he shall be compensated until he returns to his original start.

Sec. 13.4 Employees when instructed to park on a specific jobsite, the EMPLOYER shall, with all possible means, have the Employee residing nearest to the jobsite report for work there, if qualified.

Sec. 13.5 *Mechanics Only:* Shift seniority shall prevail on selection of shifts in truck shop providing the mechanics have equal qualifications.

### ARTICLE XIV – LABOR WORK

Section 14.1 Chauffeurs are exempt from all labor work except when necessary to clean their truck body or to maintain the safety of their vehicles in the event of an emergency or breakdown. Chauffeurs may be required to act as flagman upon request by the EMPLOYER. Chauffeurs shall operate one vehicle only, unless said vehicle is replaced with another. Chauffeurs shall maintain their trucks at the job site for loading until quitting time.

Sec. 14.2 *Supply and Service Truck Drivers:* Supply and service truck drivers shall load and unload their vehicles, except where doing so will infringe on the work of other trades or where the equipment or material to be loaded or unloaded is unreasonably heavy and help is needed, it shall be supplied.

Sec. 14.2 The EMPLOYER shall equip all trucks and tractors with workable heaters and defrosters.

### ARTICLE XV – NON-DISCRIMINATION

Section 15.1 The EMPLOYER and the UNION agree they will continue not to discriminate against any individual with respect to their hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, national origin, or age (to the extent prohibited by law), nor will they limit, segregate or classify Employees in any way to deprive any individual Employee of employment opportunities because of their race, color, religion, sex, national origin, or age (to the extent prohibited by law).

### ARTICLE XVI – EMPLOYMENT TERMINATION

Section 16.1(a) *No Discrimination:* There shall be no discrimination on the part of the EMPLOYER against any Employee nor shall any Employee be discharged for any UNION activity not interfering with the proper performance of their work.

Sec. 16.1(b) The EMPLOYER shall not discharge any Employee because of race, creed, national origin, sex, or age; nor because the Employee has demanded the wages, overtime or other benefits to which this Agreement entitles them.

Sec. 16.2 *Discharge or Suspension:* The EMPLOYER shall not discharge or suspend any Employee without just cause.

### ARTICLE XVII – HOLIDAYS

Section 17.1(a) Effective January 1, 2006, qualified Employees covered by this Agreement shall receive eight (8) hours straight-time pay as holiday pay (without working) for the following holidays:

- New Year's Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Christmas Day

To qualify for holiday pay, an Employee must fulfill all of the following requirements:

A. Earned a vacation the previous year OR have worked thirty-one (31) days in the current year before the holiday, or have seniority as stated in Article XIII; and

B. Must work the scheduled workday before and the scheduled workday after the holiday, and each driver must be present and available for work each workday during said holiday workweek; and

C. Worked one (1) day within the holiday week.

Sec. 17.1(b) If any of the abovementioned holidays in Section 17.1(a) is worked, double time shall be paid for all hours worked in addition to the holiday pay.

Sec. 17.1(c) If a paid holiday falls within an Employee's vacation period, he shall receive his vacation pay plus eight (8) hours' pay at straight-time for the holiday or, by agreement with EMPLOYER prior to taking his vacation, an extra day's vacation with pay in lieu of the holiday pay.  If any of the above listed holidays falls on a Saturday, it shall nevertheless be a paid holiday under this Article.

### *ARTICLE XVIII – VACATIONS AND LEAVES OF ABSENCE*

Section 18.1 Effective January 1, 2006 the EMPLOYER hereby agrees to return to the former practice and schedule in effect prior to December 31, 2002 regarding paid vacation benefits. Therefore, each employee that earned a paid vacation prior to December 31, 2002 shall retain and be accredited for all of their previously accrued vacation time, based upon their original date of hire and whether a vacation benefit was earned with the EMPLOYER.  All Employees hired after December 31, 2002, shall begin to accrue vacation time effective January 1, 2006.

Sec. 18.1(a) The vacation schedule for all Employees shall not become effective until January 1, 2006.

Sec. 18.2(a) Any Employee having worked 1200 straight-time hours, or more, in any one (1) calendar year for the same EMPLOYER shall be entitled to one (1) week vacation with pay.  In computing straight-time hours of such an Employee who has so worked, no more than forty (40) straight-time hours shall be credited in any one (1) week.

Sec. 18.2(b) Any Employee having worked 1200 straight-time hours, or more, in any one (1) calendar year for the same EMPLOYER, and who shall have worked for the said EMPLOYER at least 1200 straight-time hours in each of two (2) preceding years without a break in seniority, shall be entitled to a two (2) week vacation with pay.  Years of credit (1200 straight-time hours) need not be consecutive to earn eligibility for vacation.

Sec. 18.2(c) Any Employee having worked 1200 straight-time hours, or more, in any one (1) calendar year for the same EMPLOYER, and who shall have worked for the same EMPLOYER at least 1200 straight-time hours in each of ten (10) preceding years, without a break in seniority, shall be entitled to a three (3) week vacation with pay.  Years of credit (1200 straight-time hours) need not be consecutive to earn eligibility for vacation.

Sec. 18.2(d) Any Employee having worked 1200 straight-time hours, or more, in any one (1) calendar year for the same EMPLOYER, and who shall have worked for the same EMPLOYER at least 1200 straight-time hours in each of twenty (20) preceding years, without a break in seniority, shall be entitled to a four (4) week vacation with pay. Years of credit (1200 straight-time hours) need not be consecutive to earn eligibility for vacation.

Sec. 18.2(e) The EMPLOYER is to pay the Employee his or her vacation when he or she has earned it without taking time off, or no later than December 31st of the year he or she earned it. Vacations shall be taken at such time as agreed upon between the EMPLOYER and the Employee.

Sec. 18.2(f) In computing 1200 straight-time hours as referred to in this Article, any Employee injured or sick due to working conditions and being covered under compensation insurance and having actually worked 900 hours, shall be credited, for vacation purposes only, with such additional straight-time hours he would have worked in the anniversary year had he not been injured, but not more than forty (40) hours per week.

Sec. 18.2(g) *Leaves of Absence:* Leaves of absence may be granted to Employees by mutual agreement between the EMPLOYER, the Local Union and the Employee. Such leave, when granted, shall be in writing, with the EMPLOYER and the Employee each signing three (3) copies, one of which shall be retained by the UNION.

## *ARTICLE XIX – OWNERS-DRIVERS*

Section 19.1 Owner-Drivers operating their own vehicle are covered within the terms and conditions of this Agreement as to hours, wages, overtime, supplemental allowances, working conditions, and other provisions to the extent permitted by law. Separate checks for wages and equipment shall be issued by the contractor to such Owner-Drivers and the contractor shall maintain proper books and records for inspection by the UNION to determine the contractor's compliance with the provisions of this Agreement including the specific provision of this Article. The books and records (including payroll records, time cards, Owner-Driver operating expenses, etc.) shall be produced at the UNION headquarters upon reasonable notice.

Sec. 19.2 Detailed statements will be furnished by the contractor to such Owner-Drivers at least once a month, designating all such Owner-Drivers income and expenses for the month. Any money due at this time must be paid.

Sec. 19.3 The EMPLOYER shall identify each and every such Owner-Driver to the UNION regardless of whether or not the vehicle is licensed in the name of the driver or the lessee.

Sec. 19.4 The EMPLOYER reserves the right to control the manner, means and details of and by which such Owner-Driver performs his services, as well as the ends to be accomplished.

Sec. 19.5 Such Owner-Driver shall receive the full wages, supplemental allowances, and all working conditions provided for in this Agreement. The Owner-Driver shall receive as a minimum salary, after payment of all direct and indirect operating expenses, a sum equal to the wage and benefit amounts he would have received for the equivalent time worked on that date as an hourly rated driver. If the contractor does not provide satisfactory evidence that an Owner-Driver is paid, as provided under this Article, the contractor shall upon three (3) working days notice, discontinue use of such Owner-Driver.

Sec.19.6 Such Owner-Driver shall have complete freedom to purchase gasoline, oil, grease, tires, tubes, etc. including repair work, at any place where efficient service and satisfactory products can be obtained at the most favorable prices.

Sec. 19.7 The EMPLOYER agrees not to enter into any agreement or contract with such Owner-Driver, either individually or collectively, which in any way conflicts with any of the terms or provisions of this Article. Any such agreement shall be deemed null and void.

Sec. 19.8 In no event shall such Owner-Drivers wages be paid on a percentage basis.

Sec. 19.9 Nothing in this Article shall be construed or interpreted to require any contractor to contribute to any fringe benefit fund for the hours worked by an owner-driver.

### ARTICLE XX – MECHANIC'S TOOLS

Section 20.1 If a mechanic's tools are lost or stolen due to fire or burglary on the employer's premises or job site, the EMPLOYER will replace the tools at no cost to the mechanic. The mechanic shall be paid in accordance with the inventory list that is on file with the EMPLOYER prior to the loss. The Employee shall update the inventory list annually.

Sec. 20.2 The EMPLOYER shall furnish for use by the mechanic the necessary sockets over half (½) inch drive at no cost to the mechanic.

Sec. 20.3 There shall be at least two (2) Employees on duty in the shop at all times during the night shift.

### ARTICLE XXI – JOB ACCESS AND UNION STEWARDS

Section 21.1 The Business Representative shall have the privilege to visit the Employer's place of business and any job site to enforce the provisions of this Agreement.

Sec. 21.2(a) The EMPLOYER recognizes the right of the UNION to designate job stewards. If requested by the Local Union, the steward shall have preference for overtime, Saturday, Sunday and Holiday work and shall be the last man laid off at the conclusion of a project, provided he is qualified to perform the work. The authority of job stewards so designated by the UNION shall be limited to, and shall not exceed the following duties and activities:

(i) The investigation and presentation of grievances with his EMPLOYER or the designated EMPLOYER representative in accordance with the provisions of the Collective Bargaining Agreement.

(ii) The transmission of such messages and information which shall originate with, and are authorized by, the Local Union, or its Officers, provided such messages and information:

    (a) Have been reduced to writing; or,

    (b) If not reduced to writing, are of a routine nature and do not involve work stoppages, slow down, refusal to handle goods or any other interference with the Employer's business.

Sec. 21.2(b) Job stewards have no authority to take strike action or any other action interrupting the Employer's business.

Sec. 21.2(c) The EMPLOYER recognizes these limitations upon the authority of job stewards and shall not hold the UNION liable for any unauthorized act by the job stewards. The EMPLOYER, in so recognizing such limitations, shall have the authority to impose discipline, including discharge, in the event the steward has taken unauthorized strike action, slow down, or work stoppage in violation of this Agreement and any action taken by the EMPLOYER shall not be subject to the grievance and arbitration procedure.

Sec. 21.3 A job steward shall be a competent working Teamster.

Sec. 21.4 A steward shall not leave the job during working hours unless authorized by the EMPLOYER.

## ARTICLE XXII – PROTECTION OF RIGHTS

Section 22.1 It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action in the event an Employee refuses to enter upon any property involved in a lawful primary labor dispute, or refuses to go through or work behind any lawful primary picket line, including the lawful primary picket line of Unions party to this Agreement, and including lawful primary picket lines at the Employer's places of business. In the application of this Article it is immaterial if the labor dispute or picketing is illegal if the labor dispute or picketing is primary.

Sec. 22.2 This Article in its entirety is excluded from the application of the grievance procedure of this Agreement.

## ARTICLE XXIII – SEPARATE AGREEMENTS

Section 23.1 It is agreed that the EMPLOYER or the Employee and the UNION will not be asked to make any written or verbal agreement which may conflict with this Agreement.

## ARTICLE XXIV – COMPLIANCE WITH SAFETY AND TRAFFIC LAWS

Section 24.1 No Employee shall be responsible for the purchase or display of City or State License tags or plates. Overloading of trucks shall be the responsibility of the EMPLOYER unless it is due to the Employee's negligence. If any Employee is arrested or is issued a summons because of faulty equipment, failure to display tags or licenses, overloading or overweight, he shall not be required to surrender his chauffeurs license in lieu of bond, and if he is thereby to appear in Court on behalf of his EMPLOYER, he shall be reimbursed for his lost time at his regular straight-time hourly rate of pay, unless it is due to the Employee's negligence.

## ARTICLE XXV – ECONOMIC LOSS

Section 25.1 Employees covered by this Agreement receiving higher wages or more attractive working conditions than those provided for in this Agreement shall suffer no reduction by virtue of this Agreement, and shall be paid the increase in wages herein negotiated.

## ARTICLE XXVI – INSPECTION PRIVILEGES

Section 26.1 Authorized representatives of the UNION shall have access to the Employer's establishment at all reasonable times for the purpose of adjusting disputes, investigating working conditions, collecting dues, and ascertaining compliance with this Agreement, which shall include the right to inspect and audit those specific payroll records, time cards and sheets as may relate to a particular grievance or grievances alleging non-payment or improper payment of wages, Health and Welfare or Pension contributions. Such records shall be produced at a place mutually agreed upon.

Sec. 26.2 Employers shall keep a permanent daily payroll record of all Employees and of hours worked by Employees employed on a time basis showing starting and quitting time. Notwithstanding the limitations of Section 26.1 above, such records effective April 1, 1995, shall be preserved for a period of not less than sixty (60) months and shall be subject to examination by the UNION, but the EMPLOYER shall have the right to be present at said examination.

## ARTICLE XXVII – EMERGENCIES

Section 27.1 In case of emergencies such as floods, heavy snowfalls, fires, or other disasters, it shall be permissible for the EMPLOYER to require Employees to work additional time in the same day at the applicable rate for that day, provided there is at least a four (4) hour break in employment.

Sec. 27.2 It is understood and agreed that the above provision applies only in the event of emergencies and is not applicable where the job regularly demands more than one shift.

22

## *ARTICLE XXVIII – SALES AND TRANSFERS SCOPE OF OBLIGATION*

Section 28.1 This Agreement shall be binding upon the parties hereto, respective successors, administrators, executors, assigns and legal representatives; in the event the Employer's business or operation or party thereof, is sold, leased, transferred or taken over by any means whatsoever, including but not limited to sale, transfer, lease, succession, merger, consolidation, assignment, receivership, bankruptcy proceedings, or operation of law, or taken or absorbed by a parent company or a subsidiary company or subsidiary corporation, such business or operation shall continue to be subject to and covered by the terms and conditions of this Agreement for the life thereof. The EMPLOYER shall not use any leasing device to evade this Agreement. Nothing in this Agreement shall limit or restrict the right of an EMPLOYER to cease its business or operations.

Sec. 28.2(a) In the event an EMPLOYER buys out the business or operations of another EMPLOYER and operates it as a separate legal entity, then the seniority of the Employees shall continue on the same basis as it existed prior to the occurrence of said buy out.

Sec. 28.2(b) In the event an EMPLOYER buys out another EMPLOYER covered by this Agreement and merges operations of the bought-out EMPLOYER into his own, the seniority of the Employees shall be established as follows:

(i) In the event the acquiring EMPLOYER has bought out or merged with another solvent EMPLOYER who is covered by this Agreement, the seniority of the Employees of both Employers shall be merged within their seniority units in accordance with their dates of hire with their respective Employers, to the extent of the acquiring Employer's need as to qualifications and number of Employees. This provision shall apply only as to merged operations within the same Local Union's jurisdiction.

(ii) In the event the bought-out EMPLOYER is insolvent, the Employees of such EMPLOYER who are retained shall be placed at the bottom of the seniority list as a group listed in accordance with their previous seniority standing. The acquiring EMPLOYER need retain such Employees of the bought-out EMPLOYER only to the extent of its need as to qualifications and number.

## *ARTICLE XXIX – CONFORMITY TO LAW – SAVING CLAUSE*

Section 29.1 If any provision or the enforcement or performance of any provision of this Agreement is or shall at any time be contrary to law, then such provision shall not be applicable or enforced or performed, except to the extent permitted by law. If at any time thereafter such provision or its enforcement or performance shall no longer conflict with the law, then it shall be deemed restored in full force and effect as if it had never been in conflict with the law.

Sec. 29.2 If any provision of this Agreement or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement or the application of such provision to other persons or circumstances shall not be affected thereby.

Sec. 29.3 If any provision of this Agreement or the application of such provisions to any person or circumstances shall at any time be contrary to law, then the parties shall meet to negotiate a substitute provision which shall remain in effect until the expiration of the Agreement or until the affected provision is restored pursuant to Section 29.1 above. Should the parties bargain to impasse over the substitute provision, either or both may impose economic sanctions in support of their position and neither the grievance and arbitration provisions of this Agreement nor the no strike-no lockout provision shall be applicable.

## ARTICLE XXX – UNIFORM DRUG/ALCOHOL ABUSE POLICY

Section 30.1 The UNION recognizes that the Employers of Teamsters are required to meet the regulations established by more than one governmental agency.

It is agreed that Employers adopting the CISCO "Uniform Drug/Alcohol Abuse Program" required by State and Federal Drug Free Workplace Acts, or other policies required to meet the regulations established by the Federal Department of Transportation or the Illinois Department of Transportation, shall not conflict with the Teamsters Local Union No. 731 Area Construction Agreement.

It is further understood that policies adopted by Employers that are in excess of governmental regulations shall be subject to the Grievance Procedure established in Article VI of the Agreement.

It is recognized that some contractors require that additional substance abuse procedures be followed on their projects and it shall not be a violation of this Agreement for the EMPLOYER to comply with such procedures.

All Employees shall be compensated for any and all time spent while complying with the Drug and/or Alcohol testing procedures as established within this Agreement. Said time shall be paid at the Employee's applicable hourly wage rate.

## ARTICLE XXXI – MILITARY LEAVE OF ABSENCE

Section 31.1 An Employee selected, drafted or who volunteers for military service for the United States of America, or for any governmental agency directly connected with the defense of the United States (or its allies) shall be granted a military leave of absence with accumulated seniority for the duration of such service and at the termination thereof shall be reinstated on the seniority list in his proper classification.

## ARTICLE XXXII – WORK CONTINUATION PROGRAM

Section 32.1 In an effort to maintain a positive labor relations environment and a competitive Union construction market in the Metropolitan Chicago Area, Lindahl Brothers, Inc. and Teamsters Local Union No. 731 agree as follows:

1. The parties agree to exchange contract proposals at least ninety (90) days prior to the expiration date of the Agreement.

2. The parties agree to meet on a regular basis (to be determine) at least thirty (30) days prior to the date of expiration.

3. After the expiration date, and for thirty (30) days following, the parties shall agree to meet on Mondays, Wednesdays, and Fridays for a designated period of time (to be determined) until a new Agreement is reached.

4. Any time after the expiration date a new Agreement is reached, said terms shall be retroactive to the day after expiration.

5. If after thirty (30) days from the date of expiration and no Agreement is reached, the UNION retains the right to strike.

## ARTICLE XXXIII – DURATION AND TERMINATION

Section 36.1 This Agreement shall become effective on June 1, 2005, and shall remain in full force and effect until and including May 31, 2009. After May 31, 2009 this Agreement shall be renewed automatically for periods of one (1) year, unless either the EMPLOYER or the UNION serves written notice to the other of a desire to modify, amend or terminate same at least sixty (60) days prior to the expiration of any such period.

25

The above Agreement is hereby adopted in its entirety this _____ day of December, 2005 by and between **LINDAHL BROTHERS, INC.**, to be referred to in the above Agreement as "EMPLOYER", and the EXCAVATING, GRADING, ASPHALT, PRIVATE SCAVENGERS, AUTOMOBILE SALESROOM GARAGE ATTENDANTS AND LINEN AND LAUNDRY, LOCAL UNION NO. 731, affiliated with the International Brotherhood of Teamsters, to be referred to in the above Agreement as the "UNION."

## *AGREED:*

### *FOR THE EMPLOYER:*

LINDAHL BROTHERS, INC.
622 E. GREEN ST.
BENSENVILLE, IL 60106

BY: _____

Clarence Lindahl, Jr.
*PRINT FULL NAME*

President
*TITLE*

### *FOR THE UNION:*

EXCAVATING, GRADING,
ASPHALT, PRIVATE SCAVENGERS,
AUTOMOBILE SALESROOM GARAGE
ATTENDANTS AND LINEN AND
LAUNDRY DRIVERS LOCAL UNION
NO. 731, affiliated with the International
Brotherhood of Teamsters

BY: _____
Terrence J. Hancock, President

BY: _____
William Woldman Secretary-Treasurer

## ▼ *CONTACT INFORMATION:*

John Lindahl
*CONTACT PERSON*

(630) 595-1080
*TELEPHONE NUMBER*

(630) 595-0976
*FACSIMILE NUMBER*

26

# EXHIBIT B

# TEAMSTERS LOCAL UNION NO. 731, I. B. of T.
## GRIEVANCE REPORT

TELEPHONE: 630-887-4100        1000 BURR RIDGE PARKWAY        FAX: 630-887-4114
BURR RIDGE, IL 60527

**Please Print Information**

### Section No. 1

Employer (Co.) _LINDAHL_ _____ Date of Report _10-23-06_

Employer Address _622 E GREEN ST_ _____ Employer Phone ( _630_ ) _595-1080_

Supervisor _JOHN LINDAHL_ _____ Department _____

### Section No. 2

Employee _RUSSELL W LORENCE_ _____ Length of Service _14 MONTHS_

_833 ROWLETT AV._ _____ Job Title _DRIVER - Semi_
Address                                                    Home
_MELROSE PK_ _____ _IL_ ____ _60164_ Phone No. ( _708_ ) _492-1056_
City             State        Zip                   CELL _708-655-2293_

Contract Article Violated _16.2_ _____ Grievance Case No. _____ - _____

### Section No. 3

State Nature of Complaint: The Employer has violated the abovementioned Article(s) and including all relevant past

practices and any and all other applicable Articles of the Agreement when on (Date): _____

_UNLAWFUL TERMINATION._

_____

_____

_____

(USE OTHER SIDE IF NEEDED)

### Section No. 4

Settlement Requested: That the Contract be fully enforced, all affected parties be made whole, and

_JOB TITLE BACK AS CURRENT. NAME CLEARED_ ██ ██

_____

_____

_____

Business Representative's Signature        Member's Signature and Ledger No.

_[signature]_                               _[signature]_                     #

_WALT THIEDE_                               _RUSSELL W LORENCE_
Print Full Name                            Print Full Name

# EXHIBIT C

# TEAMSTERS  LOCAL 731

Terrence J. Hancock, President
John J. Lisner, Secretary-Treasurer

1000 Burr Ridge Pkwy., Suite 300 • Burr Ridge, IL 60527
(630) 887-4100 Fax (630) 887-4114

March 13, 2007



Mr. Russell W Lorence
833 Rowlett Ave.
Melrose Park, IL 60164

### RE: RUSSELL W LORENCE VS. LINDAHL GRIEVANCE CASE# 07-E09

Mr. Lorence:

A hearing of the above grievance will be held at the Offices of Teamsters Local
Union No. 731, 1000 Burr Ridge Parkway, Burr Ridge, Illinois at the time and date
indicated below unless sooner settled.

> **TIME:**    **9:00 A.M.**
>
> **DATE:**    **FRIDAY MARCH 23, 2007**

Please note that the committee may, by majority vote, reach a binding decision and
may act in the absence of either party. The proceedings assure an opportunity to
present matters on your behalf and to rebut testimony by your employer.

Please bring all necessary records with you. If you have any questions, please feel
free to contact the Union Office.

Sincerely,

Executive Board
Teamster Local Union No 731

cc: J. Lindahl, Lindahl

# TEAMSTERS  LOCAL 731

Terrence J. Hancock, President
John J. Lisner, Secretary-Treasurer

1000 Burr Ridge Pkwy., Suite 300 • Burr Ridge, IL 60527
(630) 887-4100 Fax (630) 887-4114

The parties comprising the Joint Area Committee for the purpose of grievance resolution hereby agree to proceed to the grievance procedure with a committee of two (2) panel members representing management and two (2) panel members representing labor.

_____
John Lindahl

_____
John Lisner

_____
Russell Lorence

Dated:        03/22/2007

# EXHIBIT D

# TEAMSTERS  LOCAL 731

Terrence J. Hancock, President
John J. Lisner, Secretary-Treasurer

1000 Burr Ridge Pkwy., Suite 300 • Burr Ridge, IL 60527
(630) 887-4100 Fax (630) 887-4114

April 16, 2007

Mr. Russell W Lorence
833 Rowlett Ave.
Melrose Park, IL 60164

APR 1 9 2007

## RE:  RUSSELL W LORENCE GRIEVANCE DECISION CASE # 07-E09

Mr. Lorence:

The Labor/Management Committee met on Friday March 23, 2007 to consider the
above grievance against Lindahl Brothers. The Committee heard the testimony of
representatives of both the Union and the Employer.

Based on the testimony heard and evidence presented the grievance is upheld, Mr.
Lorence is to be reinstated immediately with his original seniority date of hire,
however no back pay or benefits are awarded.

Any decision of the Labor/Management Committee is final and binding upon all
parties involved in a grievance.  This is in accordance with the terms of the
Collective Bargaining Agreement.

For the Labor/Management Committee,

John Lisner
Chairman

cc:   J. Lindahl, Lindahl Brothers